**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nader Eshaghian, | No. CV-25-04141-PHX-DWL (ASB) |
| Petitioner, | |
| v. | **ORDER** |
| Chris Howard, et al., | |
| Respondents. | |

On November 5, 2025, Petitioner filed a habeas corpus petition under 28 U.S.C. § 2241, a motion for discovery, a motion for appointment of counsel, and a motion for preliminary injunction or temporary restraining order ("PI/TRO motion"). (Docs. 1-4.) In a November 7, 2025 order, the Court granted the motion for appointment of counsel and motion for discovery and ordered Respondents to answer the petition and respond to the PI/TRO motion on an expedited basis. (Doc. 7).[1] Both the petition and PI/TRO motion are now fully briefed. (Docs. 22, 30). For the reasons that follow, the Court grants the petition and orders that Petitioner be immediately released from custody.

## I.     Background

Petitioner is a native of Iran who entered the United States in 1974 on a student visa and was granted lawful permanent resident status in 1978. (Doc. 1 ¶ 10; Doc. 22-1 ¶¶ 3-

---

[1] Respondents sought reconsideration of the portion of the November 7, 2025 order granting the motion for discovery. On November 17, 2025, the Court granted reconsideration, reinstated the motion for discovery as pending, and set a briefing schedule. (Doc. 14.) However, the parties later verified that no further discovery dispute existed. (Docs. 17, 28, 29.)

4.) However, after Petitioner was subsequently convicted of various criminal offenses in California state court, he was placed in removal proceedings. (Doc. 22-1 ¶¶ 5-9.) On August 1, 1995, an immigration judge ("IJ") ordered Petitioner removed to Iran. (*Id.* ¶ 11.)

Petitioner appealed to the Board of Immigration Appeals ("BIA"). (*Id.* ¶ 12.) On March 24, 1997, the BIA dismissed Petitioner's appeal, and Petitioner subsequently appealed to the Ninth Circuit. (*Id.* ¶ 15.) On June 23, 1999, while that appeal was pending, Petitioner was arrested by federal immigration authorities. (*Id.* ¶ 17.) On January 27, 2000, the Ninth Circuit dismissed Petitioner's appeal. (*Id.* ¶ 18.) On July 31, 2000, and again on September 22, 2000, Petitioner asked the BIA to reopen his immigration proceedings. (*Id.* ¶¶ 19-20.) On or about November 29, 2000, Petitioner was released from immigration custody on an order of supervision ("OSUP"). (*Id.* ¶ 21.) After being released, Petitioner was convicted of several additional crimes. (*Id.* ¶¶ 23, 24.)

On February 11, 2002, the BIA granted Petitioner's motions to reopen. (*Id.* ¶¶ 22, 25.) However, on April 28, 2003, Petitioner failed to appear at the hearing (presumably because he was incarcerated at the time), and an IJ ordered him removed in absentia. (*Id.* ¶ 25.)

On August 26, 2005, Petitioner was again arrested by federal immigration authorities. (*Id.* ¶ 27.) On January 12, 2006, Petitioner was again released from detention on an OSUP. (*Id.* ¶ 28.) After being released, Petitioner was again convicted of additional crimes. (*Id.* ¶¶ 29-31.)

On July 7, 2025, Petitioner was arrested by federal immigration authorities for the third time. (*Id.* ¶ 32.) On October 31, 2025, while in immigration detention, Petitioner was telephonically interviewed by an Iranian consular representative. (*Id.* ¶ 38.) Petitioner attests that this representative informed him that Iran would not issue travel documents for him without an original Iranian birth certificate or passport, neither of which he possesses. (Doc. 31-1 ¶ 5.) As of the date of this order, Petitioner remains in immigration custody.

## II.    Legal Standard

Under 8 U.S.C. § 1231(a)(1), the government has a 90-day period—called the

"removal period"—in which to remove an alien after a removal order becomes final. Under § 1231(a)(2), detention during the removal period is mandatory.

Under § 1231(a)(6), if the government is unable to effect removal within the 90-day removal period, continued detention becomes discretionary. That discretion, however, is not unfettered and indefinite detention is not permitted. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("[W]e read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention."). In *Zadvydas*, the Supreme Court held that six months is a "presumptively reasonable period of detention." *Id.* at 701. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If, after considering the evidence, a court finds that "removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700.

## III. Discussion

By any calculation, Petitioner has now been detained beyond the 90-day removal period and beyond the presumptive six-month limit identified in *Zadvydas*. As noted, two separate orders of removal have been issued against Petitioner. The first order of removal was issued on August 1, 1995 and became final on March 24, 1997, when the BIA dismissed Petitioner's appeal. (Doc. 22-1 ¶¶ 11, 15.) Petitioner spent approximately 16 months in immigration custody after the first order of removal became final. (*Id.* ¶¶ 17,

21.) The second order of removal was issued on April 28, 2003 and become final 30 days later (on approximately May 28, 2003) when Petitioner failed to appeal to the BIA. (*Id.* ¶ 25.) Petitioner spent approximately five months in immigration custody after the second order of removal became final. (*Id.* ¶¶ 27-28.) Finaly, Petitioner entered immigration custody for a third time on July 7, 2025. (*Id.* ¶ 32.) As of today, Petitioner has spent more than six months in immigration custody since that arrest.

Given this backdrop, the initial burden falls onto Petitioner to "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. If Petitioner meets this burden, "the Government must respond with evidence sufficient to rebut that showing." *Id.*

Petitioner has met his initial burden. Petitioner asserts there is no significant likelihood of his removal to Iran in the reasonably foreseeable future because he lacks documents sufficient to satisfy the Iranian government that he is an Iranian citizen (*i.e.* an original birth certificate or passport). In support, Petitioner proffers unrebutted evidence that he was told as much by an Iranian consular representative during his telephonic interview on October 31, 2025: "Mrs. Oghabi told me that the Iranian Interests Section would not issue travel documents to me because I do not have my original Iranian passport or birth certificate." (Doc. 31-1 ¶ 5.)

In response, Respondents argue that "[t]he mere fact that an alien's detention lacks a certain end date does not render their detention unlawfully indefinite" and cite cases supporting the proposition that "mere delay in the issuance of a travel document is insufficient to justify relief under *Zadvydas* particularly where efforts to obtain the travel document are ongoing." (Doc. 22 at 3-4, cleaned up.) Respondents also point to the fact that "Iran granted Petitioner a consular interview" as purported proof that "the Iranian government is willing to cooperate with ICE's repatriation efforts, which means that Petitioner's removal is practicable." (*Id.* at 4.) Respondents continue: "Petitioner claims that Iran will not issue travel documents for him 'without the originals of [Petitioner's] Iranian birth certificate and passport, which he does not have.' But Petitioner cannot

explain why, if ICE's prior attempt failed because they lacked these documents, Iran chose to grant him a consular interview. If his lack of documents was an absolute bar to his repatriation, as Petitioner claims, then Iran would have had no reason to interview him." (*Id.* at 5.)

Respondents' arguments are unavailing, particularly when evaluated against the broader context of Petitioner's immigration history. Petitioner was ordered removed from the United States more than 30 years ago. Nevertheless, despite repeated efforts over the ensuring three decades, Respondents have been unable to effectuate his removal to Iran. Furthermore, Respondents' declarant admits that Petitioner cannot be removed to Iran unless "Iran . . . issue[s] a travel document" (Doc. 22-1 ¶ 40), and Petitioner has come forward with unrebutted evidence that an Iranian consular representative recently told him that Iran will not issue a travel document to him (Doc. 33-1 ¶ 5). In light of that statement, it would be absurd (as Respondents argue) to view the consular interview as somehow undermining rather than supporting Petitioner's *Zadvydas* claim. The bottom line is that Petitioner has established "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.

Because Petitioner has made this showing, "the Government must respond with evidence sufficient to rebut that showing." *Id.* The only evidence proffered by Respondents is a declaration from Deportation Officer ("DO") Sergio Cabrera. (Doc. 22-1). In relevant part, DO Cabrera avows that on July 22, 2025, ICE "ordered documents related to [Petitioner's] removal order"[2] (Doc. 22-1 ¶ 33); that on August 4, 2025, Petitioner's "A file was sent to [Enforcement and Removal Operations] ERO unit to request a travel document" (*id.* ¶ 34); that on August 20, 2025, "the travel document request was sent"[3] (*id.* ¶ 35); that on or around October 30, 2025, "the Embassy of Iran[4] contacted the

---

[2] DO Cabrera does not identify what these documents are or explain what effect, if any, they might have on effectuating Petitioner's removal.

[3] DO Cabrera does not specify whether this "request" was sent from ICE to Iran or was instead an internal request between different units of ICE.

[4] This appears to be a reference to the Iranian Interests Section of the Embassy of Pakistan.

- 5 -

travel document officer to conduct a telephonic interview as soon as possible" (*id.* ¶ 37); and that on October 31, 2025, the interview took place (*id.* ¶ 38). DO Cabrera does not identify any other efforts to remove Petitioner to Iran and acknowledges that a remaining necessary step "is for Iran to issue a travel document." (*Id.* ¶ 40.) Nor does DO Cabrera identify any efforts to remove Petitioner to a third-party country (and Respondents do not assert that they are attempting to do so). This evidence is insufficient to rebut Petitioner's showing.

Although the analysis could end there, it is also notable that Respondents previously informed the Court that in response to Petitioner's discovery requests for "all documents from Petitioner's A-File that pertain to Respondents' ability to remove [Petitioner] in the reasonably foreseeable future, specifically including documents that relate to prior or current removal efforts" and for all "communications between ICE and diplomatic representatives of the government of Iran" pertaining to travel documents that would facilitate Petitioner's removal to Iran, Respondents located "only two responsive documents," both of which Respondents then withheld from Petitioner on privilege grounds. (Doc. 25 at 2-3.) Respondents described the first withheld document as "a copy of a formal request made to the Iranian government in 2000 for travel documents" and the second withheld document as "one email sent to diplomatic representatives of Iran to request a consular interview for Petitioner." (*Id.*) This description of the universe of responsive-but-withheld documents, if anything, further undermines Respondents' position, as Respondents conspicuously do not identify any document suggesting that Iran's diplomatic representatives have ever voiced an intent to issue a travel document to Petitioner or otherwise facilitate Petitioner's removal to Iran. Instead, the latest word on this subject is Petitioner's unrebutted avowal that an Iranian consular representative told him on October 31, 2025 that Iran would not issue travel documents to him. (Doc. 31-1 ¶ 5.)

Accordingly, Petitioner is entitled to release based on Ground One of the petition.[5]

---

[5] In Ground Two of the petition, Petitioner raises a challenge to the possibility he might be removed to a third country. (Doc. 1 at 6-7.) However, the parties' subsequent

- 6 -

**IT IS ORDERED:**

(1) Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) is **granted** as to Ground One.  Ground Two is **dismissed** without prejudice.

(2) Respondents must **immediately release** Petitioner from custody.

(3) No more than **48 hours** from the time of this Order, Respondents must file a notice of compliance.

(4) Petitioner's Motion for Preliminary Injunction or Temporary Restraining Order (Doc. 3) is **denied as moot**.

(5) The Clerk of Court must enter judgment accordingly and close this case.

Dated this 8th day of January, 2026.

_____
Dominic W. Lanza
United States District Judge

---

filings are devoid of any evidence that Respondents are seeking to remove Petitioner to a third country.  Petitioner's claim in Ground Two is thus too conjectural and hypothetical to support standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Accordingly, Ground Two is dismissed without prejudice.